**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| **CHARLES E. HILL & ASSOCIATES,** | § | |
| **INC.,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 2:09-CV-313-JRG** |
| | § | |
| **ABT ELECTRONICS, INC. ET AL.** | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the parties' claim construction briefing.  This Order addresses the parties' various claim construction disputes.  The Order will first briefly address the patents-in-suit and then turn to the merits of the claim construction issues.

## I.      BACKGROUND AND THE PATENTS-IN-SUIT

On October 9, 2009, plaintiff Charles E. Hill & Associates, Inc. ("Plaintiff") brought this action against defendants Abt. Electronics, Inc., PetMed Express, Inc., and Polo Ralph Lauren Corporation (collectively, "Defendants"), alleging infringement of U.S. Pat. No. 5,528,490 (the "'490 Patent"); U.S. Pat. No. 5,761,649 (the "'649 Patent"); and U.S. Pat. No. 6,029,142 (the "'142 Patent") (collectively, the "Hill Patents" or "patents-in-suit").  The Hill Patents are related to each other as continuations.  As such, except for their claims, the Hill Patents are identical.  A citation to the '490 Patent specification will, therefore, be considered a citation to any of the Hill Patent specifications.

The technology at issue in the Hill Patents has been described by various courts that have construed the patents.  *See*, *Charles E. Hill & Assocs., Inc. v. CompuServe, Inc.*, 33 Fed. Appx. 527 (Fed. Cir. 2002) [hereinafter *CompuServe II*]; *Charles E. Hill & Assocs., Inc. v. CompuServe, Inc.*, 65 F. Supp. 2d 924 (S.D. Ind. 1999) (McKinney, J.) [hereinafter *CompuServe I*]; *Charles E. Hill & Assocs., Inc. v. CompuServe, Inc.*, No. IP 97-0424-C-M/S, 2003 WL

23101797 (S.D. Ind. August 29, 2003) [hereinafter *CompuServe III*]; *Charles E. Hill & Assocs.,*

*Inc. v. CompuServe, Inc.*, No. IP 97-0434-C-M/S, 2003 WL 22327827 (S.D. Ind. Sept. 26, 2003)

[hereinafter *CompuServe IV*]; *Charles E. Hill & Assocs., Inc. v. Amazon.com, Inc.*, No. 2:02-cv-

00186-TJW, 2005 WL 2483510 (E.D. Tex. Oct. 7, 2005) (Ward, J.) [hereinafter *Amazon*];

*Charles E. Hill & Assocs., Inc. v. Abercrombie & Fitch Co.*, No. 2:07-cv-00234-DF, Dkt. No.

228 (E.D. Tex. Nov. 21, 2008) (Folsom, J.) [hereinafter *Abercrombie*].   In general, the Hill

Patents disclose:

> an electronic catalog shopping system that uses software on both the customer's computer and the vendor's computer to provide the customer with updated catalog information each time the system is used. The invention contemplates the use of two kinds of catalog data: "variable data" and "constant data." The patent defines variable data as data that is stored on the vendor's computer and that can change at any time. Constant data is stored on both the vendor's computer and the customer's computer. Whenever the constant data is updated, the updated version is assigned a revision number.

> When a customer using the invention of the '490 patent seeks information about a particular product in the catalog, the customer selects that product from a list on his computer. The software on the customer's computer causes the system to compare the revision status of the constant data on the customer's computer with the revision status of the constant data on the vendor's computer. If the constant data on the customer's computer is out of date, the vendor's computer automatically updates it.

> Once the constant data has been updated, the vendor's computer transmits to the customer's computer the variable data that relates to the selected product along with instructions that allow the customer's computer to integrate the variable data with the constant data stored on the customer's computer. The customer's updated constant data and the incoming variable data are then integrated to create a data sheet containing the most current information available about the desired product.

*CompuServe II*, 33 Fed. Appx. at 529.

## II.    LEGAL PRINCIPLES

### A.    Claim Construction Principles

"A claim in a patent provides the metes and bounds of the right which the patent confers

on the patentee to exclude others from making, using or selling the protected invention." *Burke,
Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction
is an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967,
970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims,
the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must
contain a written description of the invention that enables one of ordinary skill in the art to make
and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which
they are a part.  *Id.*  For claim construction purposes, the description may act as a sort of
dictionary, which explains the invention and may define terms used in the claims.  *Id.*  "One
purpose for examining the specification is to determine if the patentee has limited the scope of
the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of
the patentee's invention.  Otherwise, there would be no need for claims.  *SRI Int'l v. Matsushita
Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc).  The patentee is free to be his own
lexicographer, but any special definition given to a word must be clearly set forth in the
specification.  *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992).
Although the specification may indicate that certain embodiments are preferred, particular
embodiments appearing in the specification will not be read into the claims when the claim
language is broader than the embodiments.  *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*,
34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's
decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc).  In *Phillips*,

the court set forth several guideposts that courts should follow when construing claims.   In particular, the court reiterated that "the <u>claims</u> of a patent define the invention to which the patentee is entitled the right to exclude."   415 F.3d at 1312 (emphasis added) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).   To that end, the words used in a claim are generally given their ordinary and customary meaning.  *Id*.   The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."   *Id*. at 1313.   This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to and intended to be read by others skilled in the particular art.  *Id*.

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."   *Id*.   Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument."   *Id*. at 1315 (quoting *Markman*, 52 F.3d at 978).   Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims.  *Id*. at 1314-17.   As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims."   *Bates v. Coe*, 98 U.S. 31, 38 (1878).   In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir.

1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.* Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims. *Id.*

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24. The approach suggested by *Texas Digital*—the assignment of a limited role to the specification—was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id.* at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of

"focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id*. What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id*. The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id*. at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

**B.     Construing Claim Terms that Have Previously Been Construed by This or Other Courts**

As indicated above, it is worth noting that this is not the first opportunity for this Court to construe the patents-in-suit. This Court and other courts have construed the claims in the patents-in-suit several times. *See CompuServe II*; *CompuServe I*; *CompuServe III*; *CompuServe IV*; *Amazon*; *Abercrombie*. Although the disputes in this case present many of the same issues that have already been resolved in the cases mentioned above, the Court still carefully considered all of the parties' arguments (both the new and repetitive arguments) in construing the claims in this case. *See Burns, Morriss & Stewart Ltd. P'ship v. Masonite Int'l Corp.*, 401 F. Supp. 2d 692, 697 (E.D. Tex. 2005) (describing that although a previous construction may be instructive

and provide the basis of the analysis, particularly when there are new parties and those parties have presented new arguments, the previous construction is not binding on the court).   As indicated by *Burns*, however, the previous constructions in those cases, and particularly from those in this District, are instructive and will at times provide part of the basis for the analysis. *See id.*

## III.    CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase/Clause<br>Patent No.: Claim No(s). | Agreed Definition |
|---|---|
| **"constant data"**<br>'490: 1, 15<br>'649: 16<br>'142: 1, 6, 11, 14, 17 | "product information classified as likely to change less often than variable data" |
| **textual data;**<br>'649: 1<br>**text data**<br>'142: 2–5 | "data representing computer-generated words, letters, numbers, or other characters produced on a screen" |
| **variable data**<br>'490: 1, 4, 9, 15, 17, 23, 24<br>'649: 16<br>'142: 1–5, 14, 20 | "product information classified as capable of changing at any time" |
| **revision level**<br>'490: 1 | "a designation which indicates the version of the data or program which has been changed" |
| **revision status**<br>'490: 1, 2,<br>'142: 17 | "an indication of the revision level of the relevant data" |
| **generating;**<br>'490: 1<br>**generate;**<br>'490: 1<br>'142: 1<br>**generated**<br>'490: 5, 18<br>'142: 1 | "producing by performing specific operations" |
| **maintaining;**<br>'490: 1, 15 | "keeping the most current information available" |

| | |
|---|---|
| '142: 17<br>**maintained**<br>'490: 1<br>'142: 1 | |
| **updating**<br>'490: 1, 15 | "an automatic process of adding, modifying, or deleting data records or program files to bring the remote computer up-to-date" |
| **map**<br>'490: 9, 24<br>'649: 3, 18 | "instructions to integrate or combine data on the remote computer which establish the relative positions of, or the spatial relations or distributions of, data to be displayed on the remote computer" |
| **main computer;**<br>'490: 1–4, 9, 15–17, 23, 24<br>'649: 1, 3, 16, 18<br>'142: 1, 13, 14, 17, 20<br>**vendor's main computer**<br>'649: 1, 16 | "a computing device used by and/or on behalf of the vendor" |
| **The following "product information/data" clauses:**<br><br>**information related to a product;**<br>'490: 1<br>**data related to at least one product/the at least one product;**<br>'490: 1<br>'142: 1<br>**information data related to the at least one product;**<br>'490: 1<br>'142: 1<br>**product information;**<br>'490: 2, 15<br>'649: 1, 2, 16, 17<br>'142: 1<br>**data related to a/the selected product;**<br>'490: 4, 15, 17, 23<br>'649: 1, 16, 18<br>**information related to the product;**<br>'490: 5, 18<br>**information related to a selected product;**<br>'490: 15<br>**data related to a plurality of products;**<br>'490: 15 | "information about a tangible good" |

| | |
|---|---|
| '649: 1, 16<br>**product information data related to the plurality of products;**<br>'490: 15<br>**data . . . associated with the selected product;**<br>'490: 15<br>**product information data related to a/the selected product;**<br>'490: 15<br>'649: 1, 16<br>**product data . . . related to a/at least one of the plurality of products;**<br>'490: 15<br>'649: 1, 16<br>**product data;**<br>'649: 1, 3, 16, 18<br>**product information data;**<br>'490: 15,<br>'649: 1, 2, 16<br>'142: 1<br>**product data . . . related to the selected product;**<br>'649: 1, 16, 18<br>**product information related to the selected product;**<br>'649: 16<br>**product information data related to at least one product/the at least one product**<br>'142: 1 | |
| **order of the steps in claim 1 of the '490 Patent**<br>'490: 1<br>**order of the steps in claim 1 of the '142 Patent**<br>'142: 1 | "step 1 occurs before steps 2 or 3; step 2 occurs before step 5; step 3 occurs before step 4; step 4 occurs before step 5; and step 5 occurs before step 6, although step 6 may begin before step 5 is complete as long as step 5 completes before step 6 completes" |
| **product**<br>'490: 1, 2, 4, 5, 15, 17, 18, 23<br>'649: 1–3, 16–18<br>'142: 1 | "tangible good" |
| **storing**<br>'490: 1, 5<br>'649: 1, 16<br>'142: 1, 17<br>**stored**<br>'490: 1, 5 | "recorded in a storage device so that data can be obtained as necessary to perform the steps of the claimed method" |

| | |
|---|---|
| '649: 1, 16<br>'142: 1, 17 | |
| **The following "selecting" limitations:**<br><br>**selecting a product from the memory of the remote computer**<br>'490: 2<br>**selecting a product from the remote computer memory**<br>'490: 15<br>**selecting at least one product at the remote computer**<br>'649: 1, 16 | "product selection must be from products stored in memory on the remote computer" |
| **order of the steps in claim 2 of the '649 Patent**<br>'649: 2 | "the step of claim 2 cannot be completed until the 'combining' step of claim 1 is completed" |

(*See* Dkt. No. 214, Ex. 1.)  In view of the parties' agreements on the proper construction of each of the identified terms, the Court adopts the parties' agreed constructions.  The agreed constructions govern this case.

## IV.    CONSTRUCTION OF DISPUTED TERMS

### A.    Graphics Data

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "Data representing computer-generated pictures produced on a screen" | "Data representing computer-generated pictures produced on a screen. Graphics range from simple lines, bars or graphs to colorful and detailed images. Graphics data are product information classified as likely to change less often than variable data." |

### i.    The Parties' Positions

Plaintiff proposes that "graphics data" means "data representing computer-generated pictures produced on a screen."  Defendants, on the other hand, argue that the Court should construe "graphics data" to mean: "data representing computer-generated pictures produced on a screen.  Graphics range from simple lines, bars or graphs to colorful and detailed images.  Graphics data are product information classified as likely to change less often than variable

10

data." As is evident from their proposed constructions, the parties agree that "graphics data" should be defined to mean at least "data representing computer-generated pictures produced on a screen." The parties, however, dispute whether: (1) the second sentence of Defendants' proposed construction is necessary to understand the meaning of the term "graphics data;" and (2) all "graphics data" must necessarily be "constant data."

### ii. Discussion

The claim term "graphics data" appears, in representative form, in Claim 1 of the '649 Patent:

> A method for accessing product information data related to a selected product stored in a vendor's main computer from a customer's remote computer, the method comprising:
>
> storing product data including *graphics data* and textual data related to a plurality of products in a memory of the main computer;
>
> storing a first subset of product data including *graphics data* related to at least one of the plurality of products in a memory of the remote computer;
>
> selecting at least one product at the remote computer;
>
> transmitting a data request query related to the at least one selected product from the remote computer to the main computer;
>
> identifying a second subset of product data including *graphics data* and textual data related to the selected product from the product data stored in the memory of the main computer based on the data request query;
>
> transmitting the textual data from second subset of product data from the main computer to the remote computer;
>
> transmitting only updated *graphics data* from the second subset of product data that is different from the graphics data in the first subset of product data from the main computer to the remote computer;
>
> storing the updated *graphics data* in the memory of the remote computer; and
>
> combining the textual data from the second subset of product data received from the main computer with *graphics data* related to the selected product

> stored in the memory of the remote computer to provide complete product information data related to the selected product including both *graphics* and textual *data*.

'649 Patent at 21:54-22:19 (emphasis added).  The term was construed by both Judge Ward in the *Amazon* Case and Judge Folsom in the *Abercrombie* Case.  Judge Ward construed "graphics data" as "data <u>related to</u> computer-generated pictures produced on a screen. Graphics range from simple line or bar graphs to colorful and detailed images."  *Amazon*, 2005 WL 2483510, at *7 (emphasis added).  Judge Folsom construed "graphics data" slightly differently, as "data <u>representing</u> computer-generated pictures produced on a screen. Graphics range from simple lines, bars or graphs to colorful and detailed images." *Abercrombie*, Dkt. No. 228 at 18-21 (emphasis added).  Judge Folsom found that:

> use of the word "related" in Judge Ward's definition may allow a misunderstanding regarding whether text or items are considered "graphics data." The Court finds that such a misunderstanding would be an improper use of the term "graphics data." The patent indicates that "graphics data" and "textual data" are different.  '490 Patent at 2:57-58 ("Constant data includes both graphics data and textual data.").  Furthermore, both the plain meaning of "graphics" and every relevant example in the specification indicates that "graphics data" is a picture, illustration or some type of image as compared to text: "graphics data *illustrating* various catalog items," "graphics data by phone lines 22 is very slow, especially if *high resolution* is desired," technical data sheets with *high resolution* graphics," "graphics data for *outlines and boxes*," "graphics data *illustrating* the configuration of various products," and, "Dimensional Data *downloaded as text data, but must be processed to create a graphics file* in order to display the borders around the text." Thus, both the plain meaning of the term "graphics data" and its usage throughout the subject patents confine "graphics data" to a picture, illustration or some type of image.

*Id*. at 20-21 (emphasis in original) (internal citations omitted).  As such, to clarify that "graphics data" cannot be text, Judge Folsom replaced Judge Ward's "related to" language with "representing."  *Id*.  The parties agree that the first sentence of Judge Folsom's construction is correct, and as illustrated above, the construction is fully supported by the specification.  *See also*

'490 Patent at 1:59-61 ("For instance, the customer's computer may include *high resolution* graphics data illustrating the various catalog items in detail."); 16:7-10 ("[C]ustomer's computer 18 provides graphical information to the customer as illustrated at block 266. Illustratively, customer's computer displays *drawings of an electric motor . . . ."*).  As such, the Court adopts the first sentence of the parties' proposed construction.

In the second sentence of their proposed construction, Defendants argue that the Court should include the statement: "Graphics range from simple lines, bars or graphs to colorful and detailed images."  Judge Folsom adopted this exact language in the *Abercrombie* case, and Judge Ward adopted almost identical language in the *Amazon* case.  *See Abercrombie*, Dkt. No. 228 at 21; *Amazon*, 2005 WL 2483510, at *7 ("Graphics range from simple line or bar graphs to colorful and detailed images.").  Defendants contend that the language is appropriately clarifying because it identifies examples of "graphics data" so as to avoid confusion with the contrasting term "textual data."  Defendants' proposed examples are supported by the specification.  *See, e.g.,* '490 Patent at 1:59-61; 16:7-10; 9:40-44.  Furthermore, Defendants are correct that the examples will assist the jury in distinguishing between "graphics data" and "textual data."  Therefore, the Court adopts the second sentence of Defendants' proposed construction.

The third sentence of Defendants' proposed construction of "graphics data" seeks to import a limitation, requiring that all "graphics data" must necessarily be "constant data."  The parties have agreed that "constant data" is "product information classified as likely to change less often than variable data."  Defendants urge the Court to adopt the following limitation with regard to "graphics data:" "Graphics data are product information classified as likely to change less often than variable data."  As such, Defendants argue that "graphics data" are necessarily "constant data" and can never be "variable data."  Defendants, however, fail to identify anything

in the intrinsic record that would require as such.   Although, as Defendants note, the

specification explains that "[c]onstant data includes both graphics data and textual data" (*see*

'649 Patent at 1:59-60), Claim 20 of the '649 Patent provides:

> The method of claim 16, wherein the constant data includes high resolution
> graphics data and the <u>variable data includes textual data</u>.

'649 Patent at 24:45-47 (emphasis added).  Given that the Claim 20 expressly states that variable

data can include textual data, it appears that the patentee did not intend the statement "[c]onstant

data includes both graphics data and textual data" to be limiting.

Furthermore, a comparison of Claim 1 of the '649 Patent with Claim 16 of the '649

Patent illustrates that the patentee replaced the terms "graphics data" and "textual data"  in Claim

1 with the terms "constant data" and "variable data" in Claim 16.   As such, Defendants'

proposed construction of "graphics data" would violate the doctrine of claim differentiation by

rendering Claim 1 superfluous.  *See Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182,

1187 (Fed. Cir. 1998).  Although the doctrine of claim differentiation is not a hard and fast rule

of construction, it does create a presumption that each claim in a patent has a different scope.  *Id.*

As the Federal Circuit has explained:

> 'There is presumed to be a difference in meaning and scope when different words
> or phrases are used in separate claims. To the extent that the absence of such
> difference in meaning and scope would make a claim superfluous, the doctrine of
> claim differentiation states the presumption that the difference between claims is
> significant.'

*Id.* (quoting *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

"Such a presumption can be overcome, but the evidence must be clear and persuasive."  *Modine*

*Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545 (Fed. Cir. 1996).  Here, as discussed above,

there is nothing in the intrinsic record requiring that all "graphics data" be "constant data" or that

"graphics data" cannot be "variable data."   Although the specification provides that "constant

14

data" can include "graphics data" (*see, e.g.,* '649 Patent at 1:59-60; 3:45-49; 9:37-42), such statements do not rise to the level of a clear disclaimer of claim scope.  As such, the Court concludes that the claim differentiation presumption has not been overcome by "clear and persuasive" evidence.

**In conclusion, the Court adopts the following construction of "graphics data:" "Data representing computer-generated pictures produced on a screen. Graphics range from simple lines, bars or graphs to colorful and detailed images."**

### B. The Data Request Limitations

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "a request for information from a database" | "sending a request for information from a database without providing customer access to browse through data on the main computer" |

### i. The Parties' Positions

Plaintiff argues that the Court should construe the term "data request query" to mean "a request for information from a database."  Defendants, on the other hand, argue that the Court should construe the phrase "<u>transmitting</u> a data request query" (emphasized to show that Defendants seek to construe slightly different language) to mean "sending a request for information from a database without providing customer access to browse through data on the main computer."  The parties' primary dispute is whether the limitation "without providing customer access to browse through data on the main computer" should be imported into the term "transmitting."

### ii. Discussion

The term "transmitting a data request query" appears in Claims 1, 8, and 16 of the '649 Patent.  Claim 1 of the '649 Patent is representative:

15

A method for accessing product information data related to a selected product stored in a vendor's main computer from a customer's remote computer, the method comprising:

> storing product data including graphics data and textual data related to a plurality of products in a memory of the main computer;

> storing a first subset of product data including graphics data related to at least one of the plurality of products in a memory of the remote computer;

> selecting at least one product at the remote computer;

> *transmitting a data request query* related to the at least one selected product from the remote computer to the main computer;

> identifying a second subset of product data including graphics data and textual data related to the selected product from the product data stored in the memory of the main computer based on the *data request query*;

> transmitting the textual data from second subset of product data from the main computer to the remote computer;

> transmitting only updated graphics data from the second subset of product data that is different from the graphics data in the first subset of product data from the main computer to the remote computer;

> storing the updated graphics data in the memory of the remote computer; and

> combining the textual data from the second subset of product data received from the main computer with graphics data related to the selected product stored in the memory of the remote computer to provide complete product information data related to the selected product including both graphics and textual data.

'649 Patent at 21:53-22:19 (emphasis added).  In the *Amazon* case, Judge Ward construed "data request query" to mean "a request for information from a database."  *Amazon*, 2005 WL 2483510, at *7.  In so doing, Judge Ward rejected the limitation proposed by the Defendants here, explaining:

> The defendants argue that "data request query" is a term of art. The defendants contend that it means, in the context of the patent, a "statement for extracting data from a database <u>without providing customer access to browse through data on the main computer.</u>" The first part of the definition "statement for extracting data

from a database" is the defendants' proposed definition for query. The second half of the definition, "without providing customer access to browse through data on the main computer," is derived from the prosecution history. During prosecution, the patentee stated:

> In the method of the present invention, only a data request query is transmitted from the remote computer to the main computer. The customer at the remote location does not have access to the vendor's computer system to browse through data on the main computer.

> '649 patent, Amendment and Reply, Paper 10, July 2, 1996. <u>The court is not persuaded that the defendants' requested limitation is called for by the cited portion of the prosecution history. Read in context of the patent, it appears that the applicant was addressing the automatically establishing/automatically disconnecting features of the patented invention, not the characteristics of the data request query.</u> These features are claimed in dependent claims of the '649 patent.

*Id.* at *6-7 (emphasis added).  Furthermore, in the *Abercrombie* case, the parties stipulated that "data request query" should be construed in accordance with Judge Ward's construction, and Judge Folsom adopted the parties' stipulated construction.  *Abercrombie*, Dkt. No. 228 at 18-21 (construing "data request query" to mean "a request for information from a database").

Here, as in the *Amazon* case, Defendants primarily rely on the prosecution history of the '649 Patent to support their proposed limitation that reads: "without providing customer access to browse through data on the main computer."  Defendants contend that at least the following portions of the prosecution history demonstrate that the claimed invention never allows the customer to browse the main computer data:

> Therefore, in the method of the present invention, only a data request query is transmitted from the remote computer to the main computer. The customer at the remote location <u>does not have access to the vendor's computer system to browse through data on the main computer.</u>

(Dkt. No. 203, Ex. A at 4) (emphasis added).

> Therefore, in the method of the present claimed invention, only a data request query is transmitted from the remote computer to the main computer. The customer at the remote location <u>does not have access to the vendor's computer system to browse through data on the main computer.</u>  The software of the present

> invention controls when the data link between the remote computer and the main
> computer is connected and disconnected.  These claimed steps of the present
> invention increase system security and efficiency of computer resource utilization.

(Dkt. No. 203, Ex. B) (emphasis added).

> In the present invention, after a product is selected, the remote computer
> automatically establishes the data link between the remote computer and the main
> computer. The customer does not have the opportunity to dial up the main
> computer and browse the memory of the main computer.  This improves the
> security of the main computer.

*Id*. at 17 (emphasis added).   As Judge Ward concluded in *Amazon*, however, when the

prosecution history is read in light of the claims and specification of the '649 Patent, the

prosecution statements that the Defendants rely upon appear to be referring to the automatic

connection and disconnection aspects of the claimed invention.

To illustrate, the specification explains that the first object of the invention is "to provide

the customer with an instantaneous distribution of the latest catalog data available." '649 Patent

at 2:3-5.  The specification then explains how this goal is attained.  *Id*. at 2:5-34.  This object,

however, is not the only object of the invention.  Rather, the specification explains that:

> Another object of the present invention is to minimize computer on-line time. A
> common disadvantage of conventional dial-up catalog systems is that a customer
> can log on to a vendor's computer and never log off. In other words, the customer
> has control over when to log on and when to log off vendor's computer. This can
> tie up vendor's computer for long periods of time. …
>
> In the electronic catalog system of the present invention, the customer does not
> have the privilege of determining when to log on or when to log off the vendor's
> computer. The catalog system of the present invention automatically determines
> when it is necessary to log on to vendor's computer to retrieve additional data.
> Because all of the general catalog data is resident on the customer's computer, the
> normal browsing the user might do is accomplished locally at the customer's
> computer. The customer's computer automatically connects itself to vendor's
> computer and automatically requests the needed information only after the desired
> product has been selected from data on the customer's computer. The customer's
> computer automatically logs off vendor's computer after the requested data is
> received. Therefore, the electronic catalog system of the present invention
> typically reduces the on-line time by about 70-80%.

*Id*. at 2:35-59 (emphasis added).  The specification also explains that this automatic connection/ disconnection aspect of the invention "reduces customer access to [the] vendor's computer system" thereby "increase[ing] system security," which is yet another "object of the present invention."  *Id*. at 2:60-3:8.  These "objects" however are addressed in different claims of the '649 Patent.    Claims  4,  5,  10,  12,  and  19  specifically  address  the  automatic connecting/disconnecting features of the invention.  For Example, Claims 4 and 5 provide:

> 4. The method of claim 1, further comprising <u>automatically establishing a data link</u> between the remote computer and the main computer after the selecting step.

> 5. The method of claim 4, further comprising <u>automatically disconnecting the data link</u> between the remote computer and the main computer after the second subset of product data is transmitted from the main computer to the remote computer.

*Id*. at 22:27-34 (emphasis added).  Considering that Claims 4, 5, 10, 12, and 19 depend from claims reciting the term "transmitting a data request query," importing Defendants' proposed limitation would violate the doctrine of claim differentiation.

One  of  the  prosecution  history  statements  upon  which  Defendants'  rely,  however,  is particularly persuasive.  The patentee stated that:

> Geoffrey does not disclose or suggest anything whatsoever <u>to do with improving efficiency and security</u> of the electronic catalog system <u>by generating a data request query</u> related to a selected product at a remote computer, and then transmitting the query to the main computer as recited in claim 75.  <u>As discussed above, the present claimed invention does not permit or require the customer to log on to a computer and access a memory of the main computer.  Claim 75 is separately patentable at least on this basis</u>.

(Dkt. No. 203, Ex. B at 11) (emphasis added).  However, Claim 75, which is somewhat similar to Claim 8 of the '649 Patent, does not include the automatically connecting/disconnecting feature of the claimed invention.  *Id*. at 23.  Rather, as in the '649 Patent, those features are explicitly provided for in Claims 79 and 80.  *Id*. at 24.  Although the patentee's description of Claim 75

indicates that the automatically connecting/disconnecting features of the invention were intended to fall within the scope of Claims 1, 8, and 16 of the '649 Patent, this statement does not rise to the level of a "clear disavowal" of claim scope.  *See Home Diagnostics, Inc. v. LifeScan, Inc*., 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."); *see also Phillips*, 415 F.3d at 1317 (explaining that because the file history "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings).  This is especially true in light of the fact that Claim 75 contains a "generating" limitation, which is tied to and relied upon in the prosecution history statement at issue.  Neither Claims 1 nor 16 of the '649 Patent contain such a limitation.  And although Claim 8 of the '649 Patent does contain a "generating" limitation, it also contains other limitations that differ from those contained in Claim 75 of the prosecution history.  As such, each of the claims in '649 Patent are distinguishable from Claim 75, and although it is admittedly a close call, the Court concludes that the prosecution statement at issue here does not clearly disavow the broad scope of the claims containing the "transmitting a data request query limitation."

Finally, during Defendants' oral argument at the *Markman* hearing, while discussing construction of the terms "automatically connecting" and "automatically disconnecting," Defendants' counsel stated that the limitation of the customer's inability to browse the main computer is certainly included in the concept of automatically connecting and disconnecting and would appropriately be added to that term.  *Markman* Hearing Transcript at 53:12-15.  The court agrees with Defendants that the limitation does indeed go hand-in-hand with the concept of automatically connecting and disconnecting rather than the term "data request query."

The parties' final dispute is whether it is necessary to construe the term "transmitting" to mean "sending."  Plaintiff argues that no construction of this term is necessary – rather, the term should be accorded its ordinary meaning.  Plaintiff, however, also argues that if the Court deems it necessary to construe the term, the Court should construe it to mean "sending."  Defendants argue that the term should be construed to mean "sending."  Construing the term "transmitting" to mean "sending," however, will not assist the jury in making their infringement determinations.  The term transmitting is not a term of art, and the patents-in-suit do not use the term in a manner contrary to its ordinary meaning.  As such, the Court agrees with Plaintiff that the term "transmitting" needs no further construction.

**In conclusion, the Court adopts Plaintiff's proposed construction of "data request query" – that is, "a request for information from a database."**  Although it is a close issue, the Court rejects Defendants' argument that the prosecution history statements upon which Defendants rely rise to the level of a clear disavowal of claim scope.  **Finally, the Court rejects Defendants argument that the term "transmitting" should be construed to mean "sending."**

**C.      The Integrating Limitations and the Combining Limitations**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "merging or uniting in a meaningful way" | "merging or uniting in the remote computer the constant data and variable data in a meaningful way" |

The parties agree to combine their positions regarding the terms "integrating" and "combining" because those terms are used consistently in the patents-in-suit.  Thus, this Court will analyze the terms together.  Neither Plaintiff nor Defendants takes issue with the construction of the terms "integrating" or "combining" as "merging or uniting in a meaningful way."  Judges McKinney and Folsom have defined the term "integrating" as "merging or uniting in a meaningful way," and both parties agree to such a construction for both terms.  *CompuServe*

*I*, 65 F. Supp. 2d at 942-43; *Abercrombie*, 2008 WL 5771130, at *29-32.   However, Defendants request additional language be added to the construction for clarification.   Defendants urge that the terms "integrating" and "combining" may only be used in reference to an action taking place in the remote computer, and that it involves the merger of constant and variable data.   Plaintiff, however, argues the terms "integrating" and "combining" are readily understandable and require no construction, and in the alternative, that the terms' plain meaning of "merging or uniting in a meaningful way" be adopted, without further clarification that such occur in the remote computer.

### i.      The Parties' Positions

Plaintiff first argues that the term "integrating" is plainly understandable and requires no construction.   Further, Plaintiff argues that, if the Court determines it is necessary to construe the terms, it should be construed as Judges McKinney and Folsom previously construed the term "integrating" as "merging or uniting in a meaningful way."   Plaintiff urges the additional language in Defendants' construction is redundant and unnecessary, given that the claim language itself specifies where the integrating must take place ("in the remote computer") and what must be integrated ("the constant data" and "the variable data").   *See* claims 1, 15 of the '490 Patent and claim 1 of the '142 Patent.

Defendants take no issue with Plaintiff's construction but instead, urge to clarify when the term is used and to what it is referring – in other words, that the <u>integrating</u> must take place in the remote computer and involves the merger of constant and variable data.   The Patent specification at issue, including the "integrating" language, reads as follows:

> "[the] vendor's computer transmits a map to the customer's computer which permits the customer's computer to integrate the variable data received from the vendor's computer with the constant data related to the selected product stored in the customer's computer. … [the] [c]ustomer's computer 18 reads the received

variable data at block 364 and integrates the variable data received with the constant data on customer's computer. ..."

'490 Patent at 2:17-23 and 21:38-40.  Defendants claim that, based on the clear language of the specification, the integration of data must take place in the remote computer and only involves the merger of constant and variable data.  Defendants further point out that Plaintiff does not claim its construction is incorrect but merely unnecessary.

####    ii.    Discussion

The Court holds that it is necessary to construe the terms "integrating" and "combining." Further, the Court holds that "integrating" and "combining" be construed as "merging or uniting in the remote computer the constant data and variable data in a meaningful way."  Plaintiff does not contend that Defendants' construction is incorrect but merely argues that additional language to clarify the term is unnecessary.   In fact, Plaintiff explicitly states that it agrees with Defendants that the plain language of the claims is clear that (1) the integrating step must take place in the remote computer when the term "in the remote computer" or "in the customer's remote computer" is used in conjunction with the term "integrating," and (2) the combining step must take place in the remote computer when the term "in the remote computer" or "in the customer's remote computer" is used in conjunction with the term "combining."  (Dkt. No. 206 at 13.)  **Therefore, because the parties essentially do not dispute the construction of the terms "integrating" and "combining" as requiring integration in the remote computer of constant and variable data, this Court construes the term consistent with the construction in which both parties agree as "merging or uniting in the remote computer the constant data and variable data in a meaningful way."**

### D.   Remote Computer / Customer's Remote Computer

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction is necessary.  Or, alternatively, if the Court construes the terms, they should be construed as:<br><br>*remote computer*: "a computer that is located at a different physical location than the main computer"<br><br>*customer's remote computer*: "a remote computer for use by a customer or prospective customer" | Defendants believe that *remote computer* and *customer's remote computer* should be construed together and have the same meaning: "a computer that is located at a different physical location than the main computer for use by a customer or prospective customer" |

The two terms at issue here are "remote computer" and "customer's remote computer." The dispute for the Court to resolve is whether the terms "remote computer" and "customer's remote computer" have the same meaning or whether the terms should have separate constructions.  Plaintiff argues the terms should have a different meaning, and in accordance, if the Court chooses to construe the terms, Plaintiff has provided a different construction for each term.  On the other hand, Defendants have proposed a different construction for each term.  The actual language of the parties' proposed constructions, however, is not in dispute.[1]   The Court (1) agrees with Defendants that a construction is necessary, (2) agrees with Plaintiff that "remote computer" and "customer's remote computer" have different meanings and should have different constructions, and (3) adopts the alternative constructions of the terms that are proposed by the Plaintiff.

---

[1] That is, as one can tell from reading the parties' constructions, Defendants' construction merely combines the separate constructions of the Plaintiff into a single construction for both terms. Therefore, once the Court resolves the dispute as to whether "remote computer" and "customer's remote computer" have the same meaning, the construction will be apparent.

### i.      The Parties' Positions

Plaintiff first argues that these two terms do not need construction because construing these terms will not assist the jury's understanding of the terms.  Perhaps because Judge Folsom decided these terms needed construction in *Abercrombie*,[2] however, Plaintiff has proposed alternative constructions for the Court to consider if the Court decides that a construction is necessary.

In this regard, Plaintiff argues that the terms "remote computer" and "customer's remote computer" have different meanings.  In support, Plaintiff points out that some claims use the term "remote computer" and some claims use the term "customer's remote computer."  For example, claims 1-5, 9, 15-18, 23, and 24 of the '490 Patent and claims 1, 13, 14, 17, and 20 of the '142 Patent only claim a "remote computer" and do not add the additional "customer's" qualifier.  On the other hand, claims 1 and 16 of the '649 Patent use the language "customer's remote computer."  Furthermore, Plaintiff points out that Judge Folsom was correct in *Abercrombie* when he concluded that the terms must have a different meaning.  Judge Folsom in *Abercrombie* stated that it disagreed that the terms had the same meaning because "neither 'consistency' nor the quoted portions from the intrinsic record provide an appropriate basis to import a limitation into the claims of the '490 and '142 Patents."  *Abercrombie*, Dkt. No. 228 at 27.

Finally, if the Court decides construction is necessary but agrees with Plaintiff that the terms must have a different meaning, then Plaintiff proposes "remote computer" be construed as "a computer that is located at a different physical location than the main computer" and

---

[2] *See* Dkt. No. 228, at 26-32.

"customer's remote computer" be construed as "a remote computer for use by a customer or prospective customer."

Defendants, on the other hand, argue that a construction of the terms "remote computer" and "customer's remote computer" is necessary.  Defendants point out that Judge Folsom agreed that a construction was necessary in *Abercrombie*.  *Id.* at 26-32.  Additionally, Defendants argue that under *02 Micro Int'l Ltd. v. Beyond Innovation Tech., Ltd.*, 521 F.3d 1351 (Fed. Cir. 2008), because the parties dispute the scope of the terms "remote computer" and "customer's remote computer," the Court should construe those terms.

Defendants also argue that the terms "remote computer" and "customer's remote computer" have the same meaning and should be given the same construction.  Defendants' basic argument is that the terms are used interchangeably in the Patent.  *See, e.g.*, '649 Patent 21:54-55 & 60; 23: 47-48 & 24:1.  Defendants also point the Court to Judge Ward's claim construction order in the *Amazon* case.  *Amazon*, 2005 WL 2483510.  Judge Ward gave the terms "main computer" and "vendor's main computer" the same construction.  *Id.* at *9.  And Defendants argue that the terms "main computer" and "vendor's main computer" are akin, relationally speaking, to the terms "remote computer" and "customer's remote computer." Finally, Defendants suggest the Court should limit the "remote computer" to a "customer's remote computer" because the specification of the patents clearly describes the present invention in terms of a remote computer at the customer's location.  *See, e.g.*, '490 Patent, 1:7-11 ("More particularly, the present invention relates to an improved electronic catalog system capable of providing a <u>customer at a remote location</u> with accurate updated product information from a vendor each time the customer uses the electronic catalog system.") (emphasis added).

Finally, if the Court agrees with Defendants that "remote computer" and "customer's remote computer" should have the same meaning, Defendants propose the terms be construed as "a computer that is located at a different physical location than the main computer for use by a customer or prospective customer."

### ii.    Discussion

The Court holds that it is necessary to construe the terms "remote computer" and "customer's remote computer."  In *02 Micro*, the Federal Circuit stated that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  521 F.3d at 1362.  Therefore, in that case, the Federal Circuit found it was reversible error because the district court failed to construe the terms "only if" because the district court decided that the term needed no construction and it could be given its ordinary meaning.  *Id.* at 1361-63.  *But see Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206-07 (Fed. Cir. 2010) (rejecting Defendants' contention that *02 Micro* stands for the proposition that every term in dispute must be given a specific construction—i.e., something more than an ordinary meaning construction and then confirming that a court can resolve a claim construction dispute by rejecting a narrow claim construction and concluding that no additional construction is required).  In this case, by arguing whether "remote computer" is the same as "customer's remote computer," the parties dispute the scope of the term "remote computer" because the implicit issue is whether that term should be limited to a customer's remote computer.  Therefore, there is an issue of disputed claim scope for the Court to decide.  Further, even if this Court were to reject a narrowing construction as in *Finjan*, an ordinary meaning construction for "remote computer" or "customer's remote computer" would not be helpful for the jury.  Rather, both

parties agree that the terms can be defined by explaining their relationship with the main computer.

The bigger issue, however, is whether the "remote computer" and "customer's remote computer" should be given the same meaning. The Court holds that the terms do not have the same meaning. First, the Court agrees with Judge Folsom in *Abercrombie* that "neither 'consistency' nor the quoted portions from the intrinsic record provide an appropriate basis to import a limitation into the claims of the '490 and '142 Patents." *Abercrombie*, Dkt. No. 228 at 27. The Federal Circuit has cautioned that "limitations appearing in the specification will not be read into claims, and . . . interpreting what is meant by a word in a claim is not to be confused with adding an extraneous limitation appearing in the specification, which is improper." *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (citing *Intervet Am., Inc. v. Kee-Vet Labs.*, Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989)) (internal quotes omitted). In that regard, nowhere in the patent specification (or prosecution history) is there any clear disclaimer of claim scope that would require the Court to effectively read in a limitation to "remote computer" that it be a "customer's remote computer."

Second, the terms should have different meanings because there is a presumption that different words have different meanings. *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) ("There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims."); *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("we must presume that the use of these different terms in the claims connotes different meanings"). In the present case, as noted above, some claims in the related patents-in-suit used the term "remote computer" and some claims used the term "customer's remote computer." It is presumed that these words, therefore,

have different meanings.  Defendants may argue that claim 1 of the '649 Patent—where the claim uses both "customer's remote computer" and "remote computer" to refer to the same object—supports Defendants' argument that the patents-in-suit meant for "remote computer" and "customer's remote computer" to have the same meaning.  However, this fact does not clearly support either party because claim 1 of the '649 Patent was merely using the term "remote computer" to refer back to the "customer's remote computer" on an antecedent basis.

Finally, this Court is not convinced that Judge Ward giving "main computer" and "vendor's main computer" the same construction in the *Amazon* case supports this Court now giving "remote computer" and "customer's remote computer" the same construction.  While "main computer" and "vendor's main computer" have the same type of relationship as "remote computer" and "customer's remote computer," Judge Ward never actually decided, in the context of a dispute, that "main computer" and "vendor's main computer" should have the same construction.  Rather, in the *Amazon* case, the parties agreed that the terms should have the same construction but disputed what that construction should be.  *See Amazon*, Def's Resp. Br., Case No. 2:02-cv-186-TJW, Dkt. No. 324 at 2 ("Plaintiff agrees that 'main computer' and 'vendor's main computer' can be construed identically.")  Therefore, because the issue was never disputed before Judge Ward, Judge Ward's decision to construe "main computer" and "vendor's main computer" the same is much less persuasive than Judge Folsom's disputed decision that "remote computer" and "customer's remote computer" should not be construed the same.

After deciding that the terms "remote computer" and "customer's remote computer" should have different constructions, the actual language of the construction is not disputed.  **The Court construes "remote computer" as "a computer that is located at a different physical**

location than the main computer" and "customer's remote computer" as "a remote computer for use by a customer or prospective customer."

### E.      Coupled to the Remote Computer

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| There is no need to construe this term. However, to the extent the Court finds that construing this term would be helpful to a jury or is otherwise necessary, the term should be construed as follows: "connected to the remote computer" | "directly connected to the remote computer" |

This is not a term that has been construed in any prior case.  If the Court decides to construe this term, the only disputed issue is whether the Court should add the extra qualifier "directly," as Defendants request.  The Court holds that the qualifier, "directly," should not be included in its construction.

### i.      The Parties' Positions

Plaintiff first argues that this term does not need construction because the jury would not need assistance to determine what "coupled to the remote computer" means.  Plaintiff further argues that should the term be construed, the Court should adopt its construction of "connected to the remote computer" instead of "<u>directly</u> connected to the remote computer," as Defendants request.  Plaintiff's main argument is that there is nothing in the intrinsic record that shows that "coupled" should be limited to being "<u>directly</u> connected."

Defendants argue in their briefing that the word "coupled" should mean "directly connected."  For example, Defendants suggest that Figure 1A of the '142 Patent shows the monitor directly connected to the remote computer.  Additionally, Defendants suggest that the ordinary meaning of "coupled" supports Defendants' construction of "directly connected."  In support, Defendants cited a case, *Mosaid Techs., Inc. v. Samsung Elec. Col, Ltd. et al.*, 2004 US

Dist. LEXIS 27636 (D.N.J. Mar. 23, 2004), where that court found the term "coupled" meant "directly united, joined, or linked together."

### ii.    Discussion

The first dispute that needs to be resolved is whether "coupled" should mean "directly connected" or merely "connected."  The Court holds that "coupled" means "connected" and not "directly connected."

In this case, Defendants are seeking to add in the limitation of "<u>directly</u> connected" through the term "coupled."  Defendants have a weak case for adding in this limitation.  First, the intrinsic record has little support for this "directly connected" construction, as the '142 Patent specification never even uses the words "direct" or "directly."   Second, although certain embodiments appear to show a monitor directly connected to a remote computer, this is no way amounts to a clear disclaimer of claim scope.  *See Anderson Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1373 (Fed. Cir. 2007) ("we have warned against importing limitations from the specification into the claims absent a clear disclaimer of claim scope") (citing *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1375 (Fed. Cir. 2005).  Further, Defendants' citation to *Mosaid Techs* for their ordinary meaning argument has little relevance, if any.   When determining the meaning in of "coupled" in *Mosaid Techs*, the court was considering a different technology related to a different patent in a different context.  *See Mosaid Techs*, 2004 US Dist. LEXIS 27636 at *50-57.  Furthermore, *Mosaid Techs* was decided based on pre-*Phillips* law and the court in *Mosaid Techs* relied heavily on dictionary definitions.  Finally, during oral argument on the briefing, Defendants essentially agreed with Plaintiff's construction of the term and admitted that "directly" maybe unnecessary in the construction.    Thus, for all the

abovementioned reasons, the Court will not include the "directly" limitation into the construction for "coupled to the remote computer."

Finally, after deciding that it is not proper to include "directly" in the construction of "coupled to a remote computer," the Court must decide whether construction is even necessary. As noted above for the construction of "remote computer," the Federal Circuit in *Finjan* found no error (i.e., due to *02 Micro*) when the district court in that case rejected a party's narrowing construction and then gave the term its plain and ordinary meaning. 626 F.3d at 1206-07. The present case presents almost an identical situation. Here, the Court has rejected a narrowing construction that would include the "directly" limitation. Furthermore, the language "coupled to a remote computer" is not language that necessarily needs a construction for the jury to understand it. That is, it would not be improper here, as in *Finjan*, to give the language "coupled to a remote computer" its ordinary meaning. Nevertheless, the word "connected" is likely easier for a jury to understand than "coupled." Furthermore, aside from Defendants' request to use the language "directly," the parties otherwise agree that, if construed, the language "connected to a remote computer" would be appropriate. **Therefore, this Court construes "coupled to the remote computer" as "connected to the remote computer."**

### F.   Automatically Connecting and Automatically Disconnecting

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| There is no need to construe this term. However, to the extent the Court finds that construing this term would be helpful to a jury or is otherwise necessary, the term should be construed as follows: "connecting, without human intervention" | "the remote computer creating a link between the remote computer and the main computer without human intervention" |

The parties treat the construction of "automatically connecting" and "automatically disconnecting" to be the same issue, so the two terms are discussed together here.

32

### i. The Parties' Positions

Plaintiff argues neither term needs construction because it would not be helpful to the jury.  Alternatively, Plaintiff argues the terms should be construed as "connecting (or disconnecting), without human intervention."  This is the construction adopted by Judge Ward in the *Amazon* case.  *See Amazon*, 2005 WL 2483510, at *8.

The major dispute between the parties' constructions is whether it is a required limitation that the "remote computer" actually be the agent that performs the connecting or disconnecting.  In this regard, Plaintiff argues that the intrinsic record does not limit the "automatic connecting" or "automatic disconnecting" to be performed by the remote computer.  Defendants argue that the specification does teach and limit that the "automatic connecting" and "automatic disconnecting" be performed by the remote computer.  For example, Defendants point to the specification where it states: "In the electronic catalog system of the present invention, the customer does not have the privilege of determining when to log on or when to log off the vendor's computer . . . .  The customer's computer automatically connects itself to the vendor's computer . . . ."  '490 Patent, 2:44-54 (emphasis added).  Furthermore, Defendants state that Plaintiff admitted in the *CompuServe III* case, in arguing for the construction of a means-plus-function claim, that the remote computer is the structure for automatically connecting the remote computer to the main computer.  *CompuServe III*, 2003 WL 23101797, at *34-35.

### ii. Discussion

The "remote computer" is not necessarily the agent that performs the automatic connecting and/or disconnecting.  Although in most of the examples in the specification the remote computer is the agent that appears to perform the function of automatically connecting or disconnecting, there is no clear disclaimer in the intrinsic record that the remote computer is the

only agent that can perform this function.  *See Anderson*, 474 F.3d at 1373.  Furthermore, in one of the examples or preferred embodiments in the '490 Patent, the specification states that the "vendor's computer 12 automatically logs off and disconnects the data link at block 358."  '490 Patent, 21:32-34.  Defendants' proposed construction would foreclose this embodiment, and the Federal Circuit has cautioned away from interpreting claims in way that would read out disclosed or preferred embodiments in the specification.  *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007) ("We normally do not interpret claim terms in a way that excludes disclosed examples in the specification."); *see also MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").

The Court is also unconvinced of Defendants' argument that Plaintiff conceded in the *CompuServe III* action that the remote computer is the structure that performs the function of automatically connecting the remote computer to the main computer.  Defendants admit that this argument was made only with respect to a means-plus-function claim term.  And as Plaintiff correctly points out, the law is much different with respect to claim construction of a means-plus-function term as opposed to a non-means-plus-function term, as the Court considers here.  In a means-plus-function term, the "structure disclosed in the specification is a 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."  *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003), *citing B. Braun v. Abbott Labs*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).  Thus, perhaps, if the "remote computer" was the only structure clearly linked to the function of automatically connecting in a means-plus-function claim, then the structure would be limited to that (plus structural equivalents).  On the other hand, in the present case, as

discussed above, the court should not "import[] limitations from the specification into the claims absent a clear disclaimer of claim scope." *See Anderson*, 474 F.3d at 1373.  And as discussed above, Defendants have not shown a clear disclaimer in the specification or prosecution history.

Finally, although this Court rejects Defendants' proposed limitation that the customer cannot browse the main computer for the term "data request query,"[3] this Court addresses whether the limitation is appropriate for the automatically connecting/disconnecting terms.  *See supra*, Section IV.B.

In their briefing of the term "data request query," Defendants rely upon portions of the prosecution history to argue that the claimed invention never allows the customer to browse the main computer.  As explained in Section IV.B., these portions of the prosecution history relate most directly to the automatically connecting and automatically disconnecting feature of the invention.  *See supra* Section IV.B.  Further, Judge Ward stated in *Amazon* that when the prosecution history is read in light of the claims and specification of the '649 Patent, the prosecution statements that the Defendants rely on appear to be refer to the automatic connection and disconnection aspects of the claimed invention.  *Amazon,* 2005 WL 2483510, at *6-7. Finally, during oral argument in the *Markman* hearing, Defendants agreed that the limitation is certainly included in the concept of automatically connecting and disconnecting and that the limitation would appropriately be added to the term.  *Markman* Hearing Transcript at 53:12-15. Further, Plaintiff admitted during oral argument in the *Markman* that if the limitation applies anywhere, it applies to the automatically connecting and automatically disconnecting concept. *Id.* at 54:12-15.   However, Plaintiff explained that the limiting language provided in the prosecution history does not rise to the level of a prosecution disclaimer.  *Id.* at 54:15 – 55:20.

---

[3] *See supra* Section IV.B.

**Therefore, the Court construes "automatically connecting" as "connecting, without human intervention and without access to browse the data on the memory of the main computer" and "automatically disconnecting" as "disconnecting, without human intervention and without access to browse the data on the memory of the main computer."**

## V.    CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

IT IS SO ORDERED.

**So ORDERED and SIGNED this 10th day of January, 2012.**

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE